Filed 3/28/22  Allison v. Love Boutique-Vista CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| RICH ALLISON,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LOVE BOUTIQUE-VISTA, LLC,<br><br>    Defendant and Respondent. | D078445<br><br><br>(Super. Ct. No. 37-2020-00001260-CU-CR-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas, III, Judge.  Affirmed.

The Rava Law Firm and Alfred G. Rava for Plaintiff and Appellant.

Fox Rothschild, John J. Shaeffer and Andrew W. Russell for Defendant and Respondent.


INTRODUCTION

Rich Allison brought an action under Civil Code section 51,[1] the Unruh Civil Rights Act (Unruh Act or the Act), and section 51.5, after an adult store

---

[1]    Unspecified statutory references are to the Civil Code.

denied him entry into its four-hour "Ladies Night" event because the event, which involved educating women about intimate sexual products, was restricted to women.  The trial court sustained the adult store's demurrer and dismissed the complaint.  We conclude the trial court properly determined, based on the facts contained in the complaint and the materials attached to the complaint, that the adult store's decision to limit attendance of the Ladies Night event to women did not violate the Unruh Act.

BACKGROUND

I.

*Factual Background*[2]

At all relevant times, Love Boutique-Vista, LLC d/b/a Déjà Vu Love Boutique (Love Boutique) was the owner and operator of an adult store in Vista, California.  In the ordinary course of its business, Love Boutique "welcomed adults of all sexes" and "displayed, demonstrated, and sold sex toys, BDSM (Bondage, Discipline, Sadism, and Masochism) devices, pornographic videos, condoms, and lingerie to all adults no matter their sex."

However, on January 20, 2019, between 6:00 p.m. and 10:00 p.m., Love Boutique held a women-only "Ladies Night 2019" event.  It charged $25 for attendance, for which the purchaser in return received a ticket to enter the event and a $25 gift card.  The first 50 women to purchase tickets also received a free "goodie bag."

Love Boutique publicized the event on its website, where it stated the event was for " 'Ladies 21+ ONLY,' " and explained, " 'This isn't just a night for women with significant others though, it's also a great time for single

---

2      Our recitation of the facts is derived from Plaintiff's complaint.

women that are looking for a night out and learning more about finding their perfect toy/toys, lubes, and lingerie!'"

Love Boutique also publicized the Ladies Night event on its "Facebook website." Attached as "Exhibit 1" to the complaint were 17 pages of content from Love Boutique's "Facebook website" relating to the "Ladies Night 2019" event. Many of these posts contained a graphic with text that said, "LADIES NIGHT," "21+ [¶] LADIES ONLY," gave the date and time of the event, and provided information about the cost of tickets, the fact that a gift card was included with the purchase of a ticket, and the possibility of receiving a gift bag.

One Facebook post dated December 11, 2018, also stated, in part, "Every year we hold a Ladies Only Night where we invite several of our favorite toy & lingerie companies to join us for a night of fun and education! Mostly fun but you will also learn how to set up the perfect Valentines Day for you and your lover!" Another post dated December 27 stated, in part, "If you don't know, Ladies' Night is our annual event where we close down the store and open the door to ladies only; with food drinks, games, and lots of amazing prizes!"

Three of the Facebook posts relating to the Ladies Night 2019 event were introduced with the statement, "Ladies' Night vendor announcement!" The vendor announcements included images of the vendors' products. One such "vendor announcement" stated that the maker of an "ever popular [brand name sexual device], and many of your favorite dildos, will be joining us on January 20th to share their best-selling products with you!" Another "vendor announcement" stated that a vendor of another sexual device would be attending the event, and stated, "Stop by Vanessa's table so she can tell you all about this amazing, app-enabled toy that'll create a powerful

3

connection between you and your lover for nights to come[.]"  A third "vendor announcement" stated that a seller of a "premium . . . clitoral . . . toy" would be "joining us on January 20th to share" its product "with you."

Also within Exhibit 1 was a January 21 Facebook post that stated, "HUGE thank you to all of our incredible reps for coming out to Ladies' Night 2019 and making the night one to remember!"  Underneath this date and statement were photos of individuals standing next to tables on which various items and photos of models in lingerie were displayed.

Allison alleges that after visiting Love Boutique's website and Love Boutique's "Facebook website pages," and "encounter[ing]" exclusionary "terms," he went to Love Boutique to try to attend the Ladies Night 2019 event.  While the event was in progress, he and three male companions went to the entrance of the store.  They were met by a female employee or agent of Love Boutique.  They told her they wanted to attend the Ladies Night 2019 event, and they offered to purchase tickets.  The employee or agent told Allison and his male companions they could not enter the store and attend the event "because they were men," and Love Boutique "was allowing only women to enter [Love Boutique]'s Ladies Night 2019."  Another female employee or agent of Love Boutique told Allison he was welcome to return on another night.

After Allison and his male companions were turned away from the Ladies Night 2019 event, "a woman and a female friend" were allowed to buy tickets and enter.  Allison and his male companions also "observed several heterosexual couples attempt to enter the Ladies Night 2019 event and then walk away because [Love Boutique] prohibited the men in those heterosexual couples from attending the event."

4

*Procedural Background*

On January 9, 2020, Allison filed a putative class action lawsuit against Love Boutique on behalf of himself and all others similarly situated.[3] He alleged, on information and belief, that in addition to the "Ladies Night 2019" event held on January 20, 2019, Love Boutique had also hosted similarly advertised, "no-men-allowed" events in January 2018 and January 2017. He further alleged that Love Boutique's annual Ladies Night event "marginalized males and non-binary persons and caused discontent, animosity, harm, resentment, or envy among the sexes, [and] constituted arbitrary, unreasonable, and/or invidious discrimination[.]" He asserted causes of action against Love Boutique for violation of sections 51 and 51.5.[4]

Love Boutique demurred to the complaint, arguing that limiting attendance of its annual four-hour Ladies Night event to women was not

---

[3]     Allison's class allegations defined two classes:  (1) "All men and non-binary persons who were 21 years of age or older at the time of [Love Boutique's] Ladies Night 2019, Ladies Night 2018, or Ladies Night 2017 event and who were prohibited from entering . . . [the] event because of the persons' sex;" and (2) "All men and non-binary persons who were 21 years of age or older at the time of [Love Boutique's] Ladies Night 2019, Ladies Night 2018, or Ladies Night 2017 event and who visited any of [Love Boutique's] websites with the intent to use [Love Boutique's] services or goods during . . . [the] event and encountered terms or conditions . . . that excluded male and non-binary persons from full and equal access to [Love Boutique's] services and goods because of the persons' sex."

[4]     The complaint also stated a cause of action for negligence based on the same alleged acts of discrimination. In response to Love Boutique's demurrer, Plaintiff agreed to dismissal of the negligence claim. The trial court then disposed of the claim on demurrer and it was dismissed as part of the ensuing judgment.

based on irrelevant differences between the sexes and was rationally related to the nature of its business. Allison opposed the demurrer, arguing there was no justification for prohibiting men from entering an adult boutique. At the conclusion of his opposition brief, Allison stated, without elaboration, "Should the Court sustain any of the Demurrer, Plaintiff asks for leave to amend the Complaint."

The trial court sustained the demurrer without leave to amend. The court concluded that the complaint failed to allege facts sufficient to establish a violation of sections 51 or 51.5. The court's minute order stated:

> " '[T]he Act does not absolutely preclude a business establishment from disparate treatment of patrons in all circumstances. The "fundamental purpose of the Unruh Civil Rights Act is the elimination of antisocial discriminatory practices--not the elimination of socially beneficial ones[. . . ."] Thus, the Act renders unlawful ["]only arbitrary, invidious or unreasonable discrimination."' [(*Javorsky v. Western Athletic Clubs, Inc.* (2015) 242 Cal.App.4th 1386, 1394–1395 (*Javorsky*).)]

> " 'This type of unreasonable, arbitrary, or invidious gender discrimination is present where the policy or action [" ']emphasizes irrelevant differences between men and women[' "] or perpetuates any irrational stereotypes. . . .' [(*Cohn v. Corinthian Colleges, Inc.* (2008) 169 Cal.App.4th 523, 528 (*Cohn*).)]

> "Here, the complaint and exhibits thereto show that Defendant store held a ladies only event in which adult toy and lingerie companies were present to educate women as to their products for use by women. The price of admission was $25 for which attendees received a $25 gift card. Attendees also received a promotional 'goodie' bag. There are no allegations of any gender price discrimination. The limiting of attendees to women was not arbitrary or related to irrelevant differences based on sex because of the nature of the products being advertised."

6

The trial court entered a judgment of dismissal in favor of Love Boutique, from which Allison timely appeals.

## DISCUSSION

Allison acknowledges that his claim of sex discrimination is "about exclusion, not disparate pricing." However, he challenges the trial court's conclusion that Love Boutique did not violate sections 51 or 51.5 by limiting attendance of its Ladies' Night event to women. He contends the court's findings about the nature of the event were unsupported by the allegations of the complaint. He also contends that the court erred in concluding that Love Boutique's decision to limit the event to women was sufficiently justified such that it did not violate the Act. We reject these contentions and conclude the trial court did not err.

### I.

### *Legal Principles*

A. *Standard of Review*

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) " 'We treat the demurrer as admitting all material facts properly pleaded[.]' " (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*); *Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 20 ["[A] demurrer assumes the truth of the complaint's properly pleaded allegations, but not of mere contentions or assertions contradicted by judicially noticeable facts."].) We "accept as true not only those facts alleged in the complaint but also facts that may be implied or inferred from those expressly alleged." (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403; *Guerrero v. Superior Court* (2013) 213 Cal.App.4th

7

912, 925; *McMahon v. Craig* (2009) 176 Cal.App.4th 1502, 1509.) "We do not, however, assume the truth of contentions, deductions, or conclusions of fact or law." (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.)

"We also consider the complaint's exhibits." (*Hoffman v. Smithwoods RV Park, LLC* (2009) 179 Cal.App.4th 390, 400.) "While the 'allegations [of a complaint] must be accepted as true for purposes of demurrer,' the 'facts appearing in exhibits attached to the complaint will also be accepted as true and, if contrary to the allegations in the pleading, will be given precedence.'" (*Brakke v. Economic Concepts, Inc.* (2013) 213 Cal.App.4th 761, 767; *Moran v. Prime Healthcare Management, Inc.* (2016) 3 Cal.App.5th 1131, 1145–1146.) "Under the doctrine of truthful pleading, the courts 'will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed.'" (*Hoffman*, at p. 400; *Stella v. Asset Management Consultants, Inc.* (2017) 8 Cal.App.5th 181, 190.) So "[i]f the allegations in the complaint conflict with the exhibits, we rely on and accept as true the contents of the exhibits." (*SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 83.)

"In considering a trial court's order sustaining a demurrer without leave to amend, ' "we review the trial court's result for error, and not its legal reasoning." ' " (*Morales v. 22nd Dist. Agricultural Assn.* (2018) 25 Cal.App.5th 85, 93.) We " 'affirm the judgment if it is correct on any theory.' " (*Ibid.*) "And when [a demurrer] is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank*,

*supra*, 39 Cal.3d at p. 318.) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Ibid.*)

B.    *Sections 51 and 51.5*

The Unruh Act provides, in pertinent part: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (§ 51, subd. (b).)  Section 51.5 provides, in pertinent part, that "[n]o business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51[.]" (§ 51.5, subd. (a).)  Although section 51.5 is technically not part of the Act, the analysis under section 51.5 is the same as the analysis for purposes of the Act.  (*Semler v. General Electric Capital Corp.* (2011) 196 Cal.App.4th 1380, 1404 [concluding that a complaint that failed to allege a violation of the Act also failed to allege a violation of section 51.5]; *Osborne v. Yasmeh* (2016) 1 Cal.App.5th 1118, 1126.)

"The objective of the Act is to prohibit businesses from engaging in unreasonable, arbitrary or invidious discrimination." (*Pizarro v. Lamb's Players Theatre* (2006) 135 Cal.App.4th 1171, 1174 (*Pizarro*).)  The Act "does not purport to prohibit all differences in treatment or accommodations offered" (*Sunrise Country Club Ass'n v. Proud* (1987) 190 Cal.App.3d 377, 381), nor does it "entirely prohibit businesses from drawing distinctions on the basis of the protected classifications or personal characteristics" (*Howe v.*

9

*Bank of America N.A.* (2009) 179 Cal.App.4th 1443, 1450). "[T]he Act does not absolutely preclude a business establishment from disparate treatment of patrons in all circumstances. The 'fundamental purpose of the Unruh Civil Rights Act is the elimination of *antisocial* discriminatory practices—not the elimination of socially beneficial ones.' " (*Javorsky, supra*, 242 Cal.App.4th at pp. 1394–1395.) "[U]nreasonable, arbitrary, or invidious gender discrimination is present where the policy or action ' "emphasizes irrelevant differences between men and women" ' or perpetuates any irrational stereotypes." (*Cohn, supra*, 169 Cal.App.4th at p. 528.)

As our high court has stated, "[a]lthough the Unruh Act proscribes 'any form of arbitrary discrimination' [citation], certain types of discrimination have been denominated 'reasonable' and, therefore, not arbitrary." (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 30 (*Koire*).) Differential or disparate treatment "may be reasonable, and not arbitrary, in light of the nature of the enterprise or its facilities, legitimate business interests (maintaining order, complying with legal requirements, and protecting business reputation or investment), and public policy supporting the disparate treatment." (*Javorsky, supra,* 242 Cal.App.4th at p. 1395, citing *Koire*, p. 31, *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1162 (*Harris*), and *Pizarro, supra*, 135 Cal.App.4th at p. 1174.)

A "compelling societal interest" may be relied on to justify differential treatment. (See *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 743.) However, this interest need not be "extraordinarily high or laudable," but "merely one that is sufficient given the nature of the *particular* disparate treatment at issue and other attendant circumstances," that is to say, "of sufficient societal benefit to render the disparate treatment reasonable and not arbitrary." (*Javorsky, supra*, 242 Cal.App.4th at p. 1397.) "[Another]

10

basis relied on by the courts for upholding discriminatory practices as nonarbitrary is when a strong public policy exists in favor of disparate treatment." (*Pizarro*, *supra*, 135 Cal.App.4th at pp. 1174, 1176–1177.) Legislative enactments may be considered as evidence of a public policy supporting differential treatment. (*Javorsky*, at p. 1397.) However, the policy need not be expressed in a statute. (*Id.* at pp. 1397, 1403–1405 [offering health club membership to 18- to 29-year-old persons at a reduced price did not violate the Act because it provided "lower cost access to the healthful benefits" of the club without "perpetuat[ing] irrational stereotypes"]; see *Pizarro*, at pp. 1176–1177 [offering "discounted theater admission to 'baby-boomers' to attend a musical about that generation" did not violate the Act because it served to "encourage attendance at a family-based entertainment event"]; *Cohn*, *supra*, 169 Cal.App.4th at pp. 528–529 [Mother's Day giveaway that involved giving free tote bags to adult female attendees of a major league baseball game did not violate the Act; the giveaway honored mothers without promoting irrational stereotypes].)

## II.

### *Analysis*

A.  *The Trial Court's Findings Were Supported by the Complaint's Allegations and the Attached 17-Page Exhibit*

Allison first takes issue with the trial court's finding that Love Boutique's Ladies Night event involved educating women. He contends that "the only place the word 'educate' or any form or synonym of 'educate' appears in the Complaint" is in a Facebook post attached to the complaint that described the Ladies Night event as "a night of fun and education!" He argues that the complaint does not include the sentence from the trial court's minute order stating that " 'the adult toy and lingerie companies were present to educate women as to their products for use by women.' "

11

In response, Love Boutique identifies the following statements as supportive of the trial court's finding, and which appear in the body of the complaint and the attached Exhibit 1 containing Love Boutique's Facebook posts: " 'it's also a great time for single women . . . [interested in] *learning more about finding their perfect toy/toys, lubes, and lingerie*!' " (italics added); "[e]very year we hold a Ladies Only Night where we invite several of our favorite toy & lingerie companies to join us *for a night of fun and education*!" (italics added); "Stop by Vanessa's table *so she can tell you all about this amazing, app-enabled toy*" (italics added); and "[Company name] will be joining us on January 20th *to share their premium . . . clitoral . . . toy with you . . .*" (italics added).

We agree with Love Boutique that the quoted statements supported the trial court's finding the Ladies Night event involved "adult toy and lingerie companies . . . educat[ing] women as to their products for use by women." Contrary to Allison's contention that there is only one instance when the complaint used a form or synonym of the word "educate," the words "learn" (a variant of "learning"), "tell," and "share," all of which appear in the statements quoted by Love Boutique, are synonyms of "educate." Allison's other argument—that the precise sentence in the trial court's minute order did not appear verbatim in the complaint—is equally meritless. The trial court was summarizing the facts derived from the complaint; it was not purporting to quote the complaint's allegations word for word. Moreover, the court's summary was accurate and supported by the complaint.

Next, Allison appears to contend that because he affirmatively alleged in the complaint that the Ladies Night event *did* "constitute[] arbitrary, unreasonable, and/or invidious discrimination," the trial court was prohibited from concluding otherwise. (Italics omitted.) Not so. The allegations quoted

12

by Allison are legal conclusions. A demurrer admits "all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (*Blank, supra*, 39 Cal.3d at p. 318.) Here, the trial court determined that the material facts contained in the complaint revealed a rational justification for limiting the Ladies Night event to women. Since these material facts are taken as true for purposes of demurrer, but the complaint's conclusory allegations of law are not, the trial court was permitted to rely on the material facts and overlook the complaint's contrary legal conclusions when determining that the Ladies Night event did not violate the Act.

B.     *The Trial Court Properly Determined That Love Boutique Did Not Violate the Act by Limiting Attendance of the Ladies Night Event to Women*

Next, Allison contends the trial court erred by concluding that restricting attendance of the Ladies Night event to women did not violate the Act. He does not specifically challenge the court's determination that the event's articulated purpose of educating women about sexually intimate products justified the decision to limit attendance to women. Instead, he argues: "[T]here is no precedent supporting the trial court's ruling that, as alleged in the Complaint, an 'adult store, which on all nights other than the night of January 20, 2019, welcomed adults of all sexes, and displayed, demonstrated, and sold sex toys, BDSM (Bondage, Discipline, Sadism, and Masochism) devices, pornographic videos, condoms, and lingerie to all adults no matter their sex,' does not engage in arbitrary, unreasonable, or invidious discrimination by excluding male and nonbinary consumers from entering the adult store on a night when these same sex toys, BDSM devices, pornographic videos, condoms, and lingerie remain on display and for sale but for only female consumers."

However, after asserting there is "no precedent" supporting the trial court's ruling, Allison does not develop the point further. He cites several cases in his brief, which we discuss below, but he does not offer any argument why any of them reveal the trial court's decision to be erroneous. Although the trial court relied on *Javorsky* and *Cohn* in its minute order, for example, Allison does not argue that the court was incorrect to rely on these decisions or claim they failed to support the trial court's ruling. Indeed, in his appellate brief,[5] Allison does not cite or discuss *Cohn* at all.

For its part, Love Boutique contends that limiting attendance of its Ladies Night event to women was not based on irrelevant differences between the sexes, and that holding a four-hour event once a year to educate adult females about intimate sexual products for their use was not unreasonable, arbitrary, or invidious. Love Boutique further contends the trial court's decision in this case was supported by *Cohn*, and it contends the disparate treatment at issue in this case is distinguishable from gender-based price discounts held to violate the Act in cases such as *Koire*.[6]

---

[5] Allison filed an opening brief on appeal, but did not file a reply brief.

[6] Love Boutique also contends that hosting a women-only Ladies Night event was a decision supported by a public policy found in the Fourteenth Amendment to the United States Constitution. It observes that in *Lawrence v. Texas* (2003) 539 U.S. 558, 578, the United States Supreme Court held that the due process clause of the Fourteenth Amendment includes a substantive right to engage in private sexual conduct without government interference. It further observes that in *Reliable Consultants, Inc. v. Earle* (5th Cir. 2008) 517 F.3d 738, 742–743 (*Reliable Consultants*), the Fifth Circuit struck down a criminal provision that penalized the sale of sexual devices on the ground that the provision burdened the individual exercise of the substantive due process right recognized in *Lawrence*. Love Boutique contends that its Ladies Night events afforded female customers an opportunity to exercise their constitutional right to sexual intimacy. We need not and do not address

14

We conclude that the trial court correctly determined that Love Boutique's limiting attendance of the Ladies Night event to women was not arbitrary or related to irrelevant differences in the sexes, and thus did not violate the Act. The trial court's reasoning and conclusion are consistent with, and supported by, *Cohn*. In *Cohn*, the male plaintiff claimed he suffered sex discrimination in violation of the Unruh Act when female adults attending a professional baseball game were given free tote bags in celebration of Mother's Day. (*Cohn, supra*, 169 Cal.App.4th at p. 527.) The trial court granted summary judgment, and the Court of Appeals affirmed. The court explained: "The Act requires intentional discrimination to protect against all 'unreasonable, arbitrary or invidious discrimination.' " [Citation.] This type of unreasonable, arbitrary, or invidious gender discrimination is present where the policy or action ' "emphasizes irrelevant differences between men and women" ' or perpetuates any irrational stereotypes. [Citations.] The State of California has a legitimate interest in eradicating this type of discrimination because of the negative impact such prejudice has on society. [Citation.] [¶] The instant case does not emphasize an irrelevant difference, nor perpetuate an irrational stereotype. It is a biological fact that only women can be mothers. Neither men nor women are harmed by this, and the [defendant] did not arbitrarily create this difference. . . . The tote bag giveaway honors mothers as a group of individuals without promoting

---

whether the Ladies Night event was supported by a policy derived from the Fourteenth Amendment. (See *Javorsky, supra*, 242 Cal.App.4th at p. 1397.) The public policy tendered to justify a particular incident of discrimination need not be expressed in a legislative enactment. (*Ibid.*) Thus, we can consider the adequacy of Love Boutique's justification for holding a women-only event without deciding whether that justification was grounded in the Constitution.

any irrational stereotypes, and therefore does not violate the Act." (*Id.* at pp. 528–529.)

Here, Love Boutique's women-only Ladies Night was described as an event attended by vendors of intimate products, some of which were of a highly intimate sexual nature and interacted with the female physiology, to educate women about them. Much like in *Cohn*, the differential treatment of women was inseparable from matters of biological fact. Women and men have different sex organs; this is a fact. (See *United States v. Virginia* (1996) 518 U.S. 515, 533 ["Physical differences between men and women, however, are enduring[.]"].) The decision to limit attendance to adult females was thus not based on irrelevant sex characteristics.

Further, the event served a beneficial interest. As *Javorsky* explains, the " 'compelling societal interest' " justifying differential treatment need not be "extraordinarily high or laudable," but "merely one that is sufficient given the nature of the *particular* disparate treatment at issue and other attendant circumstances." (*Javorsky*, *supra*, 242 Cal.App.4th at pp. 1395, 1397.) An articulated purpose of the Ladies Night event was to educate women about the use of intimate sex products. There is a societal interest in sex education. And as Love Boutique points out, one federal court has held that the right to engage in private sexual conduct includes a right to purchase intimate sexual devices for private use. (*Reliable Consultants, supra*, 517 F.3d at pp. 746–747.) Whether recognized as a constitutional right or not, adult sexual behavior may include the use of such products. Affording women the opportunity to learn about intimate sex devices was "of sufficient societal benefit to render the disparate treatment reasonable and not arbitrary." (*Javorsky*, at p. 1397)

Given the subject matter, it was not unreasonable for Love Boutique to provide its female customers the opportunity to learn about such intimate sexual products in a limited setting. Love Boutique observes that in *Koire*, the California Supreme Court stated there "may . . . be instances where public policy warrants differential treatment for men and women," and identified "sex-segregated facilities, such as public restrooms," as an example of differential treatment "justified by the constitutional right to personal privacy." (*Koire*, *supra*, 40 Cal.3d at p. 38.) Love Boutique also cites title 8, section 3366 of the California Code of Regulations, which requires employers of five or more employees to provide separate shower rooms for each sex, as reflective of a public policy of protecting personal privacy. We further observe that Education Code section 221.5 excepts sex education classes from the prohibition on sex discrimination in elementary and secondary school classes. (See Ed. Code, § 221.5, subd. (b).) These authorities confirm that there exists a state policy permitting differential treatment of men and women for activities that are uniquely private. Although we are dealing here with an event that involved educating adults, the highly intimate nature of the products supports the conclusion that it was not unreasonable for Love Boutique to limit attendance on the basis of sex.

As noted, Allison does not present a developed argument that the trial court's decision was contrary to existing precedent. He cites a number of cases, but fails to explain how, in his view, they demonstrate error. We have reviewed the cases cited by Allison and conclude they do not undermine the trial court's ruling.

Allison cites *Javorsky* and *Pizarro* as cases standing for the general proposition that the Act prohibits businesses from depriving customers of full and equal accommodations. However, *Javorsky* and *Pizarro* are not helpful

17

to Allison.  Both *Javorsky* and *Pizarro* rejected challenges under the Act to price discounts provided to customers based on age.  (See *Javorsky*, *supra*, 242 Cal.App.4th at pp. 1401–1405 [rejecting challenge to health club's Young Professional program providing discounted membership to 18- to 29-year-old persons]; *Pizarro, supra*, 135 Cal.App.4th at pp. 1174–1176 [rejecting challenge to a price discount on theater tickets offered to individuals born between 1946 and 1964].)  And this case does not involve disparate pricing, as Allison acknowledges.  Moreover, the justification for the differential treatment in this case is at least as compelling as the justification held sufficient to support the price discounts at issue in *Javorsky* and *Pizarro*. (See *Javorsky*, at pp. 1401–1405 [price discounts offered to 18- to 29-year-old persons supported by interest in providing "healthful benefits" of health club membership to an age group with lower median incomes]; *Pizarro*, at pp. 1174–1176 [price discounts offered to " 'baby-boomers' " served the purpose of encouraging members of that generation to attend a musical about them].)

Allison also cites *In re Cox* (1970) 3 Cal.3d 205.  But the case is inapposite to the issues presented here.  In *Cox*, a customer was ejected from a shopping center after talking to his friend, a "young man[ ] who wore long hair and dressed in an unconventional manner."  (*Id.* at p. 210.)  The California Supreme Court held that the discriminatory practices barred by the Act were not limited to discrimination based on the categories listed in the Act.  (*Id.* at pp. 214–217.)  The Court observed that the Act permits businesses to "impose upon patrons reasonable regulations rationally related to the services performed and the facilities provided."  (*Id.* at p. 217, fn. 13.) However, it did not decide whether the shopping center had a reasonable

18

basis for excluding the customer. (*Id.* at p. 217.) Thus, neither the facts nor the holding of *Cox* are relevant here.

Allison also observes that in *Koire* and *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160 (*Angelucci*), women-only price discounts were held to violate the Act. Love Boutique responds that its Ladies Night event was unlike the discounts at issue in *Koire* and *Angelucci*. We agree with Love Boutique. In *Koire*, the male plaintiff sued car washes and bars for offering price discounts to female customers. (*Koire, supra*, 40 Cal.3d at p. 27.) Our high court rejected the defendants' argument that the discounts were not arbitrary because they were supported by " 'substantial business and social purposes.' " (*Id.* at pp. 32–33.) The Court found the businesses' interest in increasing profits, or encouraging women and men to socialize in a bar, insufficiently compelling to justify offering goods or services to men and women at different prices. (*Id.* at pp. 32–33.) In *Angelucci*, a supper club charged the male plaintiffs a higher price for admission than it charged women. (*Angelucci*, at p. 165.) The Court reaffirmed the principles articulated in *Koire* that "there might be public policies warranting differential treatment of male and female patrons under *some* circumstances," but that " '[a]bsent a compelling social policy supporting sex-based price differentials, such discounts violate the Act.' " (*Angelucci*, at p. 175.)

Love Boutique is unlike the car washes and bars that were charged with violating the Act in *Koire*, or the supper club sued in *Angelucci*. Love Boutique sells intimate sexual products, such that the physical differences between the sexes are uniquely relevant to its business. Moreover, Love Boutique did not lack a compelling reason for limiting attendance of its Ladies Night event to women. At least some products promoted through the

19

Ladies Night event interacted with female physiology, and vendors were announced as appearing at the event to "share" or "tell" female attendees about these products. The event's educational component, and the sexual nature of the products shared, justified Love Boutique in limiting attendance to adult females. Accordingly, Love Boutique's women-only Ladies Night event did not violate the Unruh Act.

As mentioned above, Allison argues that the same "sex toys, BDSM devices, pornographic videos, condoms, and lingerie" ordinarily sold by Love Boutique were "on display and for sale" during the Ladies Night event, the apparent point being that Love Boutique was not justified in prohibiting him and his companions from entering. Allison ignores, however, that the Ladies Night event was not described as a night of restricted access to the store for the purpose of browsing products ordinarily on display. Rather, it was described as including an educational component that entailed vendors attending, in person, to educate women and share information about intimate products for their use. Thus, limiting attendance of the event to women was not unreasonable or arbitrary, even though the products displayed throughout the store while the event was in progress were the same products ordinarily offered to men as well as women.

Next, Allison contends that limiting attendance of Ladies Night to women was at least invidious, if not unreasonable or arbitrary, and that the complaint "is replete with allegations that [Allison] was damaged by not being allowed into the Ladies Day [*sic*] 2019 event because of his sex." Although he claims the complaint is "replete" with such allegations, he unhelpfully cites series of pages from the complaint without specifying which allegations in particular he would like us to examine. We are not required to scour the record unguided, nor must we develop arguments for him. (*WFG*

20

*National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894–895.)

Allison's argument is unavailing, because notwithstanding perfunctory allegations, the complaint contains factual detail supporting the conclusion that limiting attendance of the Ladies Night event to women was not based on irrelevant differences in the sexes, and was not arbitrary or invidious. "The 'fundamental purpose of the Unruh Civil Rights Act is the elimination of *antisocial* discriminatory practices—not the elimination of socially beneficial ones.'" (*Javorsky*, *supra*, 242 Cal.App.4th at pp. 1394–1395.) *Koire* is illustrative. In *Koire*, the plaintiff was harmed by price discounts arbitrarily given to women. (*Koire*, *supra*, 40 Cal.3d at p. 34.) Our high court observed that "differential pricing based on sex may be generally detrimental to both men and women, because it reinforces harmful stereotypes," and "[m]en and women alike suffer from the stereotypes perpetuated by sex-based differential treatment." (*Ibid.*) The Court further observed that such harm emanates from differentiating "between men and women *on the basis of irrelevant and artificially created distinctions*." (*Id.* at p. 35, italics added.) Here, as we have discussed, the complaint's facts reveal that the event served a beneficial purpose, and addressed highly intimate topics that included the use of products, at least one of which had an exclusively, female-physiological focus. The sex-based limitation was relevant and biological, not irrelevant or artificially created.

In a footnote, Allison attempts to articulate a stereotype perpetuated by the event. He calls the women-only event "antiquated" and "Victorian." We disagree that these labels can be fairly applied to an event promoting the use of "app-enabled" sexual toys or "clitoral" devices. Allison posits that Love Boutique's Ladies Night event is like "Home Depot excluding female

21

customers from entering Home Depot on a Men's Night 2021 event" promoting "chainsaw and . . . power tool[s]," or "Target [holding] a Ladies Night 2021 event for which . . . cookware and dinnerware companies would be present to educate women about their products[.]" The comparison is inapt because the products on offer in Allison's hypotheticals do not serve an intimate sexual purpose or interact with physiological features associated with female or male sexual response. Instead, a better comparison would be holding a Men's Night event that involved educating men about intimate sexual devices that interact with male physiology, which would also be permissible since it would not be based on irrelevant differences between the sexes. (See *Cohn, supra*, 169 Cal.App.4th at p. 528 ["[G]iving tote bags to men on Father's Day . . . would also be valid, as it is not based on any irrelevant differences between the sexes."].)

Allison also contends the trial court erred by deciding on demurrer the fact-specific issues concerning whether, in his words, a "non-arbitrary, non-invidious, or reasonable justification for [Love Boutique's] Ladies Night 2019 sex-based discrimination *actually* exists." The California Supreme Court rejected a similar argument in *Harris*. There, the plaintiffs argued that the concepts of " 'arbitrary discrimination' and 'reasonable' regulations . . . inevitably involve fact-bound determinations requiring trial as opposed to legal issues cognizable on demurrer." (*Harris*, *supra*, 52 Cal.3d at p. 1165.) The Court disagreed: "Unruh Act issues have often been decided as questions of law on demurrer or summary judgment when the policy or practice of a business establishment is valid on its face because it bears a reasonable relation to commercial objectives appropriate to an enterprise serving the public." (*Ibid.*) Here, the facts contained in the complaint and its attachments were sufficient to allow the trial court to find that limiting

22

attendance of the Ladies Night events to women was not arbitrary or based on irrelevant differences in the sexes, and did not violate the Act. Accordingly, the trial court did not err in resolving these issues on demurrer.

Allison makes additional arguments that are also unpersuasive. He contends the complaint identifies additional reasons for the event apart from educating women about sexual toys (e.g., providing " 'foods, drinks, games, and . . . prizes' "). His focus is off the mark. The question is not whether learning about sexually intimate products was the *only* activity associated with the event. For example, restrooms may provide, in addition to toilets, sinks and towel dispensers so a person can wash and dry their hands— activities that are not inherently private—and yet, as the *Koire* court observed, restrooms may be segregated by sex without violating the Act. Rather, the question is whether the event included an activity that served as a relevant, sufficiently compelling basis for limiting attendance to women. As we have discussed, we agree with the trial court that it did.

C.    *The Trial Court Did Not Abuse Its Discretion by Denying Leave to Amend*

Allison raises the possibility of amendment. He states: "If more factual allegations are required to sufficiently plead arbitrary, unreasonable, or invidious discrimination, [he] can easily amend the Complaint to do so." But he does not identify any factual allegations he proposes to add, or indicate how they would overcome those facts already admitted in the complaint that defeat his claims. Allison bears the burden of proving a reasonable possibility of curing the defects in his complaint by amendment. (*Blank*, *supra*, 39 Cal.3d at p. 318.) "It is the plaintiff's burden on appeal to show in what manner it would be possible to amend a complaint to change the legal effect of the pleading; we otherwise presume the pleading has stated its allegations as favorably as possible." (*Fuller v. First Franklin Financial*

23

*Corp.* (2013) 216 Cal.App.4th 955, 962.)  Allison's unelaborated, unexplained assertion of an ability to amend the complaint is not sufficient to carry this burden.  Accordingly, the trial court did not abuse its discretion by denying leave to amend.

Finally, Allison contends he should be allowed to proceed to discovery so he can obtain such items as the store's video surveillance footage and determine whether there were any males present during the event.  However, his ability to proceed past the demurrer stage depends on his ability to persuade *this* court that the trial court erred in sustaining the demurrer and dismissing the case.  Because we remain unpersuaded there was such an error, the judgment will be affirmed.

DISPOSITION

The judgment is affirmed.  Love Boutique is entitled to its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


AARON, J.

24